**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-317 (TSC)** |
| **v.** | : | |
| | : | |
| **NHI NGOC MAI LE,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. Defendant Nhi Ngoc Mai Le has pleaded guilty to two second-degree misdemeanors, a violation of 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three) and a violation of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building) (Count Four). For the reasons set forth herein, the government requests that this Court sentence Le to 45 days of incarceration on Count Three followed by 36 months of probation on Count Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. In addition, given that Le is the mother to a three-month-old newborn, should the Court sentence Le to a period of incarceration, the government respectfully requests that the Court delay Le's reporting date for six months.

## I.     Introduction

Defendant Le, a 27-year-old nail salon owner from Montgomery, Illinois, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the

peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Le pleaded guilty to violations of 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G). The government's recommendation is appropriate here because Le: (1) disregarded police dispersal tactics on the West Plaza; (2) witnessed and filmed other rioters break down and breach the Parliamentarian Door, the Senate Wing Door, and a Senate office door; (3) encouraged others to enter the Capitol building; (4) entered the Capitol building amid blaring alarms and proceeded directly into a Senate office, where she posed with her feet on a desk; (5) publicly posted and privately sent inflammatory, threatening, and braggadocios social media messages before, during, and after the riot; (6) deleted all videos and images from January 6 from her phone; (7) lied to the FBI about her January 6 conduct during two voluntary, pre-arrest interviews; and (8) has thus far failed to demonstrate remorse for her actions.

The Court must also consider that Le's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Le's crime support a sentence of 30 days' incarceration on Count Three and 36 months' probation on Count Four, 60 hours of community service, and $500 in restitution.

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 18 at 1–3.

*Defendant Le's Role in the January 6, 2021 Attack on the Capitol*

On January 4, 2021, Le flew from Chicago to Atlanta to attend a rally hosted by the former President. Along the way, she published a post on her Facebook page (translated from Vietnamese to English):

> A few years ago in Saigon, people took to the streets to protest against the special zone and protect the Hoang Sa Truong Sa.[2] At that time, no one in the Vietnamese press dared to report it even though millions of people poured into the streets. Patriots were beaten. I was surprised but thinking about it, it's a very normal thing in a communist country. But now the same thing is happening in the United States of America, my second home and paradise. A free country is under attack by underground forces. Now I'm only contributing a small part, doing the least I can to save America. Money can be earned back, but moments like these only come once in a lifetime. ***Fight to the end - free or die.*** As much as you love the country, you hate the communists. See you all in Washington, D.C. 01/06. Now I'm going to see Georgia and see President Trump.

After attending the rally, Le remarked on Facebook that though it was cold at the Georgia rally, "the least we can do is to be there. If everything was burned down, we still have him. Mr. President, you're not alone. Fight for Trump Save America."

On January 5, 2021, Le flew from Atlanta to Washington, D.C. to attend the "Stop the Steal" rally and protest Congress' certification of the Electoral College vote. *See* ECF No. 18 at

---

[2] In June 2018, protests erupted across Vietnam over the government's plan to allow the leasing of land to foreign investors in three "special economic zones" (designated areas subject to unique economic regulations). More than one hundred protesters were arrested for storming a provincial government building in southeast Vietnam. *See Vietnamese Protest an Opening for Chinese Territorial Interests*, N.Y. TIMES, available at https://www.nytimes.com/2018/06/11/world/asia/vietnamese-protest-chinese.html.

3. While at the Atlanta airport, Le posted a picture of her and her husband, adding the caption: "D.C. We are coming . . . Fight for Trump . . . Save America." *See* Image 1.





*Image 1: Screenshot of Le's Facebook post from January 5, 2021*

As planned, on the morning of January 6, Le attended the "Stop the Steal" rally and saw the former President speak.

After the rally concluded, Le walked to the Capitol with other rallygoers, approaching the building from the west side. While on the western Capitol grounds, Le encountered throngs of people (*see* Images 2 and 3) and experienced the effects of pepper spray (*see* Image 4).[3]

---

[3] Le filmed her journey from the Capitol grounds to the Northwest Courtyard and later posted an edited montage to her TikTok account. *See* Exhibit 1.

4



*Image 2: Screenshot of Exhibit 1 at 00:02 of Le's view on the western Capitol grounds*



*Image 3: Screenshot of open-source video of Le surveying the crowd*



*Image 4: Screenshot of open-source video of Le shielding her eyes from pepper spray*

At approximately 2:30 p.m., after rioters overtook the police on the West Plaza, Le recorded herself ascending the Northwest Steps to the Upper West Terrace. *See* Exhibit 1 at 00:20. While on the Upper West Terrace, Le stood back as other rioters scaled the wall to reach her position (*see* Image 5), recorded her view of the West Plaza, and threw a peace hang gesture at the riotous, violent mob below her (*see* Image 6).



*Image 5: Open-source image of Le near a rioter scaling a wall*



*Image 6: Screenshot of Exhibit 1 at 00:28 of Le's view from the Upper West Terrace*

Eventually, Le migrated to the Northwest Courtyard, the area outside of two key breach points of the Capitol: the Parliamentarian Door and the Senate Wing Door. By the time she

arrived, both doors had already been breached by rioters and re-secured by the police. But the rioters—Le among them—were ready for round two. From her perch on a railing outside of the Parliamentarian Door, she took in the scene and took recordings on her phone as rioters around her shouted "Let us in," "Fight for Trump," and "We're coming for ya Nancy," blasted air horns, and violently pushed their way inside the Senate Wing Door. *See* Images 7 and 8; *see also* Exhibit 1 at 00:40-00:58.



*Image 7: Screenshot of Exhibit 2 at 00:26 of Le outside the Parliamentarian Door*



*Image 8: Open-source photo of filming the Senate Wing Door's second breach*

Then at approximately 2:42 p.m., Le stood next to a rioter as he used a crowbar to smash one of the glass panes on the Parliamentarian Door. *See* Image 9. She then recorded a quick selfie video with the damage, which she later posted to Facebook. *See* Image 10.



*Image 9: Screenshot of Exhibit 3 at 00:02 of Le standing next to the rioter breaking the windows to the Parliamentarian Door with a crowbar*



*Image 10: Screenshot of a Facebook video posted by Le of the damaged Parliamentarian Door*

Eventually, the rioter with the crowbar was able to reach through the broken window and open the Parliamentarian Door from the inside. That rioter, along with a handful of others, proceeded to charge into the Capitol building, pushing officers stationed in the Brumidi Corridor deeper into the building.

Le was not among the first to re-breach the Parliamentarian Door, having moved away from the Door's entryway just before its breach. But minutes later, having regained her courage, she approached the door again, turned to face the crowd, and enthusiastically waived others into the building. *See* Image 11.



*Image 11: Open-source photo of Le waiving rioters through the Parliamentarian Door*

At 2:44 p.m., two minutes after the Parliamentarian Door's second breach, Le entered the Capitol building. *See* Exhibit 4 at 04:48 (CCTV); Exhibit 8 at 00:03–00:07. She then stood just inside the doorway and filmed other rioters throwing their shoulders against the Senate office

door just inside the Parliamentarian Door.[4] Exhibit 4 at 04:47–04:55. She later posted that video to Facebook. *See* Exhibit 5 00:00–00:06.



*Image 12: Screenshot of Exhibit 4 at 04:49 of Le filming the breach of the Senate office*

Le entered the just-breached Senate office at 2:45 p.m. *See* Exhibit 4 at 05:17. Inside the office, she took a video, later posted to Facebook, which captured herself in a mirror. *See* Image 13. She also asked another rioter to take a picture of her jubilantly posing with her feet propped up on a desk. *See* Image 14.

---

[4] This office is called "S-131." The Architect of the Capitol has estimated that the cost of the damage to the S-131 door was $9,860.

 

*Images 13 (left) and 14 (right): On left, screenshot of Exhibit 6 at 0:05 of Le in Senate office; on right, screenshot of Exhibit 7 at 00:12 of Le posing with her feet on a desk*

Approximately two minutes later at 2:47 p.m., Le exited the Senate office. *See* Exhibit 4 at 07:39. Back in the Brumidi Corridor, Le, smiling ear to ear, filmed the crowd and bobbed up and down, evidently overwhelmed by the excitement. *See* Image 15.



*Image 15: Screenshot of Exhibit 4 at 07:51 of Le filming the crowd in the Brumidi Corridor*

But Le's joy was short-lived as she proceeded to be crushed by a stampede of rioters fleeing from police deploying chemical irritants and ushering the rioters out of the building. *See* Exhibit 4 at 09:00. About a minute later, with police approaching, Le exited the building at approximately 2:50 p.m., having spent approximately six minutes total inside. *See* Exhibit 4 09:58.

Sometime later on January 6, Le made several posts to Facebook. In one, she posted three short videos, discussed *supra*, of (1) herself in front of the damaged Parliamentarian Door (Image 10), (2) the other rioters breaking down the Senate office door (Exhibit 5), and (3) her time in the Senate office (Exhibit 6).

In another, Le posted a picture of herself in the Northwest Courtyard holding up four fingers, which presumably signified her desire for another Trump presidential term. In the caption, Le, demonstrating both a lack of remorse and humanity, said (translated from Vietnamese to English): "I put out the effort to climb the wall to visit ***the broad Pelosi, but she had already went into fucking hiding already***. Checking in at the front entry of the Capitol." *See* Image 16 (emphasis added).



*Image 16: Facebook selfie photo of Le in the Northwest Courtyard*

In addition, on the evening of January 6, 2021, Le, in private Facebook messages, told several of her friends about her experience at the Capitol. Specifically, she told them that she had gotten to the Capitol early, climbed a wall,[5] entered the building, and been pepper-sprayed by the police.

Le flew home to Illinois on January 7, 2021. Upon her arrival, she posted a photo of her view of the National Mall from the plane along with this caption (translated from Vietnamese to English): "The capital has sold itself to the devil . . . if it wasn't for President Trump. I'll never come back here again. A city of crime . . ."

*Le's Voluntary Pre-Arrest FBI Interviews*

On April 14, 2021, Le voluntarily sat down for an interview with the FBI. During the interview, she admitted to being on Capitol grounds on January 6. She claimed that she saw "two police guarding the door" to the Capitol and that after about ten minutes, they walked away and

---

[5] The claim appears to be unsupported bragging, as Le's TikTok video shows her walking up the Northwest Steps to reach the Upper West Terrace.

let protesters open the door. Le denied entering the Capitol building. Both statements are, of course, entirely contradicted by the evidence. Le watched as rioters forcibly breached not one but *three* doors: the Senate Wing Door, the Parliamentarian Door, and the Senate office door. *See* Exhibits 2, 3, 5; Image 8. At no point did any police officer "allow" protesters to open those doors. And Le, of course, did in fact enter the Capitol building, remaining inside for approximately six minutes. *See* Exhibit 4 at 05:17–09:58

One year later, on March 29, 2022, Le sat for another voluntary interview with the FBI. This time, the FBI began the interview by showing Le photos of herself both inside and outside of the Capitol on January 6. After being confronted by the evidence, Le explained that after seeing the former President speak at the Stop the Steal rally, she walked to the Capitol. She recalled seeing a Capitol door being broken by another rioter, who was then pulled away from the door by the crowd. She said that after about another ten minutes, someone else opened the door from the inside and she was pushed inside by someone behind her. Once inside, she said she quickly hid in the corner next to the door while everyone was pepper-sprayed. She said she then went inside the nearest door to her left, which led to an office. She added that she took videos that day merely to show that she did not take or destroy anything that day. But she admitted to having deleted all videos and images she took from the event. When the FBI explained to Le that the videos and photos could still be available on her iCloud account, she was able to access the backed-up copies and show them to the agents.

Though prompted by incriminating evidence to be more forthcoming this time around, Le's recounting of her January 6 conduct was nevertheless, as the evidence shows, riddled with lies and omissions. First, open-source video and CCTV demonstrate that, contrary to Le's tale, the rioter breaking down the Parliamentarian Door with the crowbar was never stopped by the

rioters. And that same rioter successfully opened the Parliamentarian Door from the inside by reaching through the window he had broken. *See* Exhibits 3, 4. Second, open-source images and CCTV disprove Le's preposterous, self-serving claim that she was pushed inside the building. *See* Exhibit 4; Image 11. And third, Le did not immediately hide in a corner when she entered the building. Rather, she stood in the entrance filming other rioters breaking down the Senate office door, which she then casually and calmly entered. *See* Exhibits 4 and 5.

*The Charges and Plea Agreement*

On September 13, 2023, the United States charged Le by a four-count Information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On November 8, 2023, pursuant to a plea agreement, Le pleaded guilty to Counts Three and Four of the Information, charging her with violations of 40 U.S.C. § 5104(e)(2)(D) (Disorderly or Disruptive Conduct in a Capitol Building or Grounds) and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). By plea agreement, Le agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Le now faces a sentencing for violating 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, she faces up to six months of imprisonment and a fine of up to $5,000. She must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As these offenses are a Class B misdemeanors, the Sentencing Guidelines do not apply to them. 18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies

the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 30 days of incarceration on Count Three, followed by 36 months of probation on Count Four. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. In addition, because Le has a three-month-old newborn, the government requests that the Court delay Le's reporting date for any period of incarceration imposed by six months.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Le's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Le, the absence of violent or destructive acts is not a mitigating factor. Had Le engaged in such conduct, she would have faced additional criminal charges.

Le came to the Capitol on January 6 ready to, as she put it days before, "[f]ight to the end – free or die." This statement reveals Le's vision and hope for a violent demonstration against the certification of the Electoral College vote. And she got her wish.

Le arrived at the Capitol when the violence on the West Plaza was at its peak. She saw another group of rioters surge past the police on the West Plaza and up the Northwest Steps. She saw rioters violently force their way into the Senate Wing Door. She stood directly next to the

rioter who hammered away at the Parliamentarian Door, reached inside, and then, alongside other rioters, breached the building. She entered the building amid ear-piercing alarms with glass from the broken windows underfoot. She observed a group of rioters use their body weight to break open a Senate office door. She experienced the effects of pepper spray on multiple occasions. And, through it all, she smiled—reveling in the chaos and brutality of the day.

After the riot, despite learning that a person had been shot in the building, Le expressed pride in the part she played on January 6 (exaggerating the extent of it to impress her friends), and mocked the then-Speaker of the House, who had been evacuated from the Capitol building. When she realized she could be in trouble, she deleted all videos and photos of January 6 from her phone. When eventually approached by the FBI, she lied, denying that she had gone into the building at all. And when given an opportunity to come clean a year later during a second interview, Le continued to lie and attempted to minimize her conduct. But most alarmingly, three years after January 6, Le has expressed no remorse for the effect of the riot or her contribution to it. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Le's History and Characteristics

According to Le, she comes from a loving family and had a peaceful childhood in a "really safe" town in Vietnam. PSR ¶ 35. She moved from Vietnam to the United States in 2015 at age 19. *Id.* ¶ 42.

On January 6, 2021, Le was employed at a nail salon as a licensed nail technician. *Id.* ¶ 57. Since then, Le has experienced several monumental life changes: she became a manager and co-owner of a nail salon (PSR ¶ 41), she welcomed her first child into the world (*Id.* ¶ 58), and, of particular note, on December 3, 2021, Le became a naturalized citizen of the United States.

The only concerning aspect of Le's background is the absence of any kind explanation or mitigating evidence for her criminal actions on January 6, 2021.

In addition, the government is sympathetic to the fact that Le is the mother to a three-month-old baby. It is regrettable that a sentence of incarceration will cause disruption to the life of that child. Nevertheless, the government maintains that in light of all of the many aggravating factors discussed *supra*, the lack of mitigating considerations, and the comparator cases discussed *infra*, a sentence of incarceration is more than warranted in this case. That is particularly so given that a delayed reporting date could be accommodated to support the more immediate needs of the child and that Le lives with several other caretakers of the child, including her husband (PSR ¶ 41) and her parents (*Id.* ¶¶ 38–39)

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Though Le has accepted responsibility to some extent by entering into a plea, her post-January 6 conduct and statements are devoid of any regret, remorse, or apology. She has not taken any steps to denounce her words and actions on January 6, 2021, including to the Probation officer who conducted her PSR interview. Thus, the Court should view any remorse Le expresses at sentencing with great skepticism. *See United States v. Matthew Mazzocco*, 21-cr-00054 (TSC), Tr. 10/4/2021 at 29–30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.").

Le did not accept the results of the 2020 presidential election, so on January 6, she invaded the Capitol and mocked those that fled the building to save themselves from people like Le. With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms. The Court must sentence Le in a manner sufficient to deter her specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Le based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Le has pleaded guilty to Counts Three and Four of the Information, charging her with disorderly conduct and parading, demonstrating, or picketing in the Capitol building, in violation of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). These offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

In cases involving Class B misdemeanors (petty offenses), sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases, in which the defendants pleaded guilty

to one count of violating 40 U.S.C. § 5104(e)(2)(G), provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Pomeroy*, 22-cr-183 (TSC), Pomeroy breached the Capitol on the east side. Like Le, he disregarded the chaos of the riot on the Capitol grounds; recorded the riot in and outside of the Capitol but deleted the media from his phone prior to his arrest; and failed to express genuine remorse for his actions prior to sentencing. While Pomeroy stayed inside the building for approximately fifteen minutes longer than Le, he did not lie to the FBI or brag about his participation in the riot online. This Court sentenced Pomeroy to 30 days of incarceration followed by 36 months of probation.

*United States v. Jarrin*, 22-cr-153 (RCL) is also instructive. Jarrin, like Le, approached the Capitol on its west side, witnessing police dispersal tactics along the way. While Jarrin breached the Capitol through the Senate Wing door minutes after its initial breach, Le entered the Capitol through the Parliamentarian Door minutes after its second breach. Both Le and Jarrin deleted media from their phones in the aftermath of the riot and lied to the FBI during their voluntary interviews. Judge Lamberth sentenced Jarrin to 30 days' incarceration and 36 months' probation.

Lastly, in *United States v. Vogel*, 21-cr-56 (CKK), Vogel, like Le, recorded his journey from the western grounds of the Capitol to the Northwest Courtyard. Both entered the Capitol amid a blaring alarm, glorified their participation in the riot on social media, and lacked remorse following the riot. Vogel ventured deeper inside the building and stayed inside for a longer period, but he did not lie to the FBI. Judge Kollar-Kotelly sentenced Vogel to 30 days' incarceration and 36 months' probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property . . . including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Le must pay $500 in restitution, which reflects in part the role Le played in the riot on January 6.[8] Plea Agreement at ¶ 10. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Le's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 87.

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Nhi Ngoc Mai Le to 30 days of incarceration on Count Three and 36 months of probation on Count Four, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Le's liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

---

[8] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

By:     _/s/ Madison H. Mumma_
        Madison H. Mumma
        Trial Attorney (Detailee)
        NC Bar. No. 56546
        601 D St. NW
        Washington, DC 20004
        (202) 913-4794
        madison.mumma@usdoj.gov